# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CASE NO. 1:12-CV-105-MR-DLH

FLEXIBLE FOAM PRODUCTS, INC.,    )
    )
    Plaintiff,    )
    )    **MEMORANDUM**
    vs.    )  **OPINION AND ORDER**
    )
VITAFOAM INCORPORATED and    )
BRITISH VITAFOAM UNLIMITED,    )
    )
    Defendants.    )
_____)

**THIS MATTER** is before the Court on the parties' cross motions for summary judgment. [Docs. 33; 37].

## FACTUAL BACKGROUND

Both Plaintiff Flexible Foam Products, Inc., ("FFP") and Defendant Vitafoam Incorporated ("Vitafoam")[1] are engaged in the manufacture of polyurethane foam products. [Id. at 1].

On November 28, 2005, Vitafoam and FFP entered into two Asset Purchase Agreements ("Agreements"). [Doc. 37-3 at 24-62; 63-97].

_____

[1] British Vitafoam Unlimited is named as a party defendant in this action solely as guarantor of Vitafoam Incorporated's indemnification obligations under Article IX of the Asset Purchase Agreement contracts at issue in this case.

Pursuant to those Agreements, Vitafoam sold to FFP (and some of FFP's affiliated corporations) certain assets at Vitafoam's manufacturing facilities in High Point, North Carolina, and Tupelo, Mississippi. While each Agreement addressed the property conveyed at each plant, the operative contract language contained in both Agreements at issue in this lawsuit is identical. [Id. at 29-30; 69-70].

In pertinent part, the Agreements state that

Seller [Vitafoam] shall sell, convey, assign, transfer and deliver to Buyers [FFP and others], and Buyers shall purchase and acquire from Seller, all of Seller's right, title and interest in and to the following assets rights and properties then owned by Seller and used or held for use primarily in the Business . . .

[Doc. 37-3 at 29]. The list of assets following that paragraph included "all of the intangible rights and properties of Seller used exclusively in the Business," and "all claims of Seller against third parties related exclusively to the Business." [Id. at 29-30]. The Business is defined in the agreements as "Seller's foam manufacturing and fabrication business conducted at the High Point Facility" [Id. at 28] and the "Tupelo Facility" [Id. at 68]. The Agreements particularly define these facilities as Vitafoam's manufacturing locations in High Point, North Carolina, and Tupelo, Mississippi. [Id.].

Specifically excluded from the assets being transferred under the Agreements are "all rights arising under any Seller Contract other than the

Assumed Contracts" and "all intangible rights and property of Seller not used exclusively in the Business (provided that such rights and property are not material to the conduct of the Business as conducted immediately prior to Closing)." [Id. at 30].

At issue in this case is whether portions of certain tort claims belonging to Vitafoam were transferred to FFP as part of the two asset purchase transactions memorialized in the Agreements.

As it pertains to this litigation, the parties use certain chemicals in their polyurethane foam manufacturing process, notably polyether polyols, toluene diisocyanates ("TDI"), monomeric or polymeric diphenylmethane diisocyanates ("MDI"), TDI-MDI blends, and certain polyether polyols systems (hereinafter generally referred to as the "Foam Chemicals"). [Doc. 40-1 at 5]. Both before and after the execution of the Agreements, FFP and Vitafoam, each independent of the other, procured Foam Chemicals from the various world-wide suppliers for use in their respective manufacturing facilities.

From approximately the middle 1990s, the global production of Foam Chemicals was controlled almost exclusively by a handful of businesses and their affiliates. In particular, these entities were BASF SE (and affiliates); the Dow Chemical Company; Huntsman International, LLC;

Lyondell Chemical Company; and Bayer AG (and affiliates). [Doc. 40-1 at 4-6]. In November 2004, a series of price-fixing class actions were brought against these Foam Chemicals manufacturing entities. Those actions ultimately were consolidated by the Judicial Panel on Multidistrict Litigation in the District of Kansas under the heading and case number, In re Urethane Antitrust Litigation, 2:04-MD-1616-JWL (D. Kan.) (herein the "Urethane cases"). [Id. at 6].

Regarding this litigation and the Agreements, the parties have entered into a stipulation [Doc. 27] setting out the agreed operative facts of this case as follows:

> 1. Attorneys in the law firm of Dickstein Shapiro LLP (the "Dickstein Firm") of Washington, D.C. and co-counsel at Adams Holcomb LLP (the "Adams Holcomb Firm") have represented, and are continuing to represent, both Vitafoam and FFP as client opt-out plaintiffs from the antitrust class action entitled *In re: Urethane Antitrust Litigation,* Civil Action No. 04-1616 (JWLIJPO) and as plaintiffs in the action entitled *Carpenter Co., et al. v. BASF, SE, et al.,* Civ. Action No. MDL 04 1616 (JWLIJPO) (Civil Action Nos. 08-2617 (JWLIJPO) and 08-5169 (D.NJ), (the *"Urethanes* action") and consolidated for pre-trial purposes with the *In re: Urethane Antitrust Litigation* action.

> 2. In June 2006 Vitafoam and FFP, and other prospective plaintiffs in the later filed *Urethanes* action, submitted notices of opt-out or exclusion from the Bayer settlement in the then pending antitrust class action suit, . . . dated June 9, 2006 . . ..

3.     In December 2008 Vitafoam and FFP, and other prospective plaintiffs in the later filed *Urethanes* action, submitted final notices of opt-out or exclusion from the then pending antitrust class action suit, . . . dated December 12 and December 18, 2008, respectively. . ..

4.     During the course of the Dickstein Firm's joint representation of FFP, Vitafoam and the other opt-out plaintiffs, the Dickstein Firm and the Adams Holcomb Firm maintained a policy of not disclosing any client's privileged or proprietary information to other clients without the applicable client's permission. This policy was explained to all clients and assented to by all clients at the outset of the representation.

5.     The Dickstein Firm represented the plaintiffs, including Vitafoam and FFP, in the full settlement in July 2007 of their claims in the *Urethanes* action as against the defendant Bayer AG ("Bayer") pursuant to Settlement Agreement dated as of July 24, 2007. The Dickstein Firm, in consultation with Bates White, LLC (the "Bates White Firm") as the experts retained by the Dickstein Firm on behalf of the plaintiffs to determine the damages sustained by each plaintiff as a result of the alleged antitrust violations by the named defendants, including Bayer, determined the proceeds of the Bayer settlement to be allocated to each plaintiff, including Vitafoam and FFP.

6.     In such determination and allocation, the amount of such settlement payment by Bayer that was allocated to and paid to Vitafoam on or around August 15, 2007, included those purchases of MDI, polyols and TDI (the urethane chemical materials subject to illegal price fixing) determined by the Bates White Firm to be attributable to the High Point and Tupelo urethane plant facilities during the claims or damages period (then 1999-2004). None of the purchases of urethane chemical materials determined by the Bates White Firm to be attributable to the High Point and Tupelo urethane plant facilities were included in the determination and allocation of the amount of such settlement payment by Bayer allocated and paid to FFP.

7.    The net settlement payment (net of Vitafoam's allocable share of fees and expenses) to Vitafoam in August, 2007, was $2,532,800. The settlement with Bayer was based on the Bates White Firm's review of sales and purchase records of MDI, polyols and TDI during the claims or damages period (then 1999-2004). The amount of the net payment made to Vitafoam from the Bayer settlement attributable to purchases of urethane chemical materials determined by the Bates White Firm to be attributable to the High Point and Tupelo urethane plant facilities was $1,301,495.

8.    Each settling plaintiff that was a client of the Dickstein Firm received information regarding its share of the Bayer settlement, but no Dickstein Firm clients received information about the settlement recoveries received by the other clients, including Vitafoam and FFP.

9.    Thereafter, the determination and allocation of plaintiffs' (including Vitafoam and FFP) claims and damages were based on the damages established by plaintiffs' experts of the Bates White Firm, for the plaintiff group and each individual plaintiff. The damages established by the experts were based primarily on the sales records of the defendant suppliers (rather than the plaintiffs' purchase records) during the claims or damages period (determined after discovery to be 1999 - 2003).

10.    For purposes of determination of the amounts of the damages sustained by Vitafoam and FFP as set forth in Direct Action Plaintiffs' Expert's Report, dated April 15, 2011 (as revised, May 13, 2011) as plaintiffs in the *Urethanes* action, all damages stemming from relevant MDI, polyol and TDI sales attributed by defendants to the High Point and Tupelo urethane facilities were included in the computation and amount of the Vitafoam claims and none thereof were included in the computation and amount of the FFP claims. The experts of the Bates White Firm were not asked to analyze the ownership of antitrust claims associated with chemical purchases attributed to the Tupelo and High Point facilities, and this stipulation does not, and is not intended to, address that issue.

11.  At the time the expert report of the Bates White Firm was finalized, no plaintiff that was a client of the Dickstein Firm was shown the amount or components of any other plaintiffs individual damage claim.

12.  Subsequent to the expert's estimation of group and individual plaintiff damages, plaintiffs settled with Huntsman and BASF. At the same time the BASF settlement proceeds were distributed, there was also a true up relating to the Bayer settlement based on a formula agreed upon by plaintiffs at the time of the Bayer settlement. Specifically, Vitafoam was allocated by the Bates White Firm an additional net settlement amount of $1,228,272 in May 2012, on account of the Bayer settlement made in July 2007, which additional amount is referred to as the Bayer "true up" amount.  Additionally, a true up of $565,870 on account of the Bayer settlement made in July 2007 attributable to damages arising from the Tupelo and High Point plants was held in escrow by the Adams Holcomb Firm pursuant to the demand of FFP made on May 4, 2012. The net amount paid to Vitafoam in May 2012 on account of the Huntsman settlement was $142,765.  The amount of the Huntsman settlement paid to Vitafoam that was attributable to damages arising from the High Point and Tupelo facilities was $84,084. The net amount allocated by the Bates White Firm to Vitafoam in May 2012 on account of the BASF settlement was $4,456,569, of which amount $1,831,786 was paid to Vitafoam. The Bates White Firm determined that $2,624,784 of the net proceeds from the BASF settlement were attributable to damages arising from the High Point and Tupelo facilities, and that portion of the settlement proceeds was held in escrow by the Adams Holcomb Firm pursuant to the demand of FFP made on May 4, 2012. The Adams Holcomb Firm has maintained the portions of the settlement proceeds held in escrow.

13.     The total amount of the Bayer, Huntsman and BASF net settlement proceeds determined by the Bates White Firm to be attributable to purchases of MDI, polyols and TDI by the High Point and Tupelo urethane plant facilities during the claims or damages period was $4,576,233. Of those net settlement

proceeds attributable to damages arising from the High Point and Tupelo facilities, $1,385,579 was distributed to Vitafoam, and $3,190,654 was held in escrow by the Adams Holcomb Firm pursuant to the demand of FFP made on May 4, 2012. The Adams Holcomb Firm has maintained the portions of the settlement proceeds held in escrow. If FFP is adjudicated to own the antitrust claims associated with purchases of MDI, polyols and TDI attributed by the Bates White Firm to the High Point and Tupelo urethane plant facilities during the claims or damages period (and not otherwise barred from asserting them), FFP would be entitled to this Tupelo and High Point allocation of $4,576,233 of the net settlement proceeds from the Bayer, Huntsman and BASF settlements. To the extent FFP is barred from asserting claims as to any of the settlement proceeds described above, the amount to which FFP would be entitled would be reduced accordingly.

14. The Bates White Firm attributed 6.889% (less applicable fees and expenses) of all the *Urethanes* plaintiffs' damages to the High Point and Tupelo urethane facilities and attributed 4.808% (less applicable fees and expenses) of all the *Urethanes* plaintiffs' damages to Vitafoam urethane facilities not sold to FFP. If (a) FFP is adjudicated to own the antitrust claims associated with purchases of MDI, polyols and TDI attributed by the Bates White Firm to the High Point and Tupelo urethane plant facilities during the claims or damages period, (b) FFP is not otherwise barred from asserting those claims, and (c) there are additional settlements or recoveries in the *Urethanes* action (beyond those recoveries from Bayer, Huntsman and BASF described above), FFP would be entitled to 6.889% (less applicable fees and expenses) of any such settlement proceeds or recoveries for the High Point and Tupelo urethane plant facilities, in addition to its allocation based on FFP's ownership of additional antitrust claims attributable to damages arising from other facilities. If (a) FFP is adjudicated to own the antitrust claims associated with purchases of MDI, polyols and TDI attributed by the Bates White Firm to the High Point and Tupelo urethane plant facilities during the claims or damages period, (b) FFP is not otherwise barred from asserting those claims, and (c) there are additional settlements or recoveries in

the *Urethanes* action (beyond those recoveries from Bayer, Huntsman and BASF described above), Vitafoam would be entitled to 4.808% (less applicable fees and expenses) of any such settlement proceeds or recoveries for facilities not sold to FFP.

## STANDARD OF REVIEW

The parties have submitted cross-motions for summary judgment under Federal Rule of Civil Procedure 56, wherein each side contends that there are no factual issues for trial and that judgment may be rendered as a matter of law based upon the record. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Upon review of the record before the Court, the Court concludes that the facts are adequately presented therein, and that no genuine dispute as to any material fact exists. Accordingly, summary judgment is an appropriate means by which to resolve the issues presented by the parties.

## DISCUSSION

At the center of this case are two critical issues the Court must resolve. First, did Vitafoam convey its antitrust claim against the <u>Urethane</u> cases defendants to FFP as an asset pursuant to the Agreements? Second, if FFP purchased, received, and owned that antitrust claim under the Agreements, is this action brought by FFP barred by the applicable North Carolina[2] statute of limitations period?

A.     <u>The Owner of the Antitrust Claim</u>.

The parties agree that the terms of the Agreements are clear, that the Agreements control the determination of this cause, and that no underlying factual dispute exists. "This is a straightforward contract interpretation case, and under the unambiguous contract terms, FFP prevails as a matter of law."  [Doc. 37-1 at 1].   "[U]nder the plain terms of the relevant 2005 agreements[,] Vitafoam did not sell and transfer to FFP … its price fixing claim[.]"  [Doc. 33 at 2].  Accordingly, the Court's first task is to determine whether or not the parties are correct in their assertion that the Agreements at issue are unambiguous.

The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine

---

[2] Pursuant to § 11.7 of the Agreements, the parties to this action have agreed to the jurisdiction and venue of this Court and to North Carolina law governing the resolution of this matter.  [Doc. 37-3 at 54; 91-2].

whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993) (citations omitted) (applying North Carolina law); accord, Atlantic and East Carolina Ry. Co. v. Wheatly Oil Co., Inc., 163 N.C.App. 748, 752, 594 S.E.2d 425, 429 (2004) ("When the language of a written contract is plain and unambiguous, the contract must be interpreted as written and the parties are bound by its terms."). The Court, having reviewed the Agreements, agrees with the parties that the Agreements are clear on their face and, therefore, summary judgment is appropriate for one side or the other in accordance with the contracts' terms.

The parties may agree on the facts underlying this case and the terms of the agreements, but unsurprisingly they rely upon different provisions of the Agreements to support their respective positions. On the

one hand, Vitafoam asserts that the Urethane cases antitrust claim was an asset excluded from sale to FFP under § 2.2(c) and (e) of the Agreements. Those subsections provide, in pertinent part, that Vitafoam kept all rights, claims, and causes of action "arising under" or arising "in connection with" any contracts not assumed[3] by FFP. The flaw in this argument, however, is that an antitrust claim is a tort claim. Delong Equip. Co. v. Washington Mills Abrasive Co., 840 F.2d 843, 848 (11th Cir. 1988) (antitrust violations "sound in tort rather than contract"); In re Mid-Atlantic Toyota Antitrust Litigation, 525 F.Supp. 1265, 1270 (D. Md. 1981) ("[i]t is clear that a civil antitrust action is an action in tort"). Further, under North Carolina law, torts and statutory violations, by their very nature, are not "rights arising under" contracts. Ellen v. A.C. Shultes of Maryland, Inc., 172 N.C. App. 317, 322, 615 S.E.2d 729, 733 (2005) (claims for unfair and deceptive trade practices and other torts or statutory violations are not an assertion of "rights arising under" relevant contracts in determining scope of arbitration clause). Therefore, Vitafoam's reliance on § 2.2(c) and (e) of the Agreements is misplaced.

FFP, on the other hand, argues that the Urethane cases antitrust claim was an asset Vitafoam conveyed to it because § 2.1(g) of the

---

[3] FFP did not assume any of Vitafoam's contracts with the Urethane cases defendants for the provision of Foam Chemicals to the High Point and Tupelo facilities.

Agreements specifically includes "all of the intangible rights and properties of Seller used exclusively in the Business[.]" [Doc. 37-3 at 29; 69]. Since the Urethane cases antitrust damages can be, and have been, allocated specifically to the High Point and Tupelo plants, FFP asserts these damages arise exclusively from those operations. This is where FFP goes adrift.

FFP conflates the concepts of severability and exclusivity. The Urethane cases antitrust claims exist to compensate those customers cheated by the Urethane cases defendants for unlawfully fixing the prices of Foam Chemicals. Vitafoam purchased Foam Chemicals for four of its United States plants, High Point and Tupelo being two of them. Vitafoam owned only one antitrust claim. As such, this claim could not be "exclusive" to any of its individual foam manufacturing facilities. Moreover, Vitafoam's antitrust claim was in no sense "used exclusively in the" High Point and Tupelo "Business[es]."[4] In fact, the antitrust claim was not "used" at all, as the context of that term in the Agreements discloses. The antitrust claim is a chose in action arising from tortious conduct entirely unrelated to the day-

---

[4] Both parties set forth forecasts of evidence regarding how the Foam Chemicals were ordered for the High Point and Tupelo plants, who placed the orders, where the invoices were sent, and similar facts regarding the normal course of conduct adopted by these two plants during the relevant time. This extraneous evidence is wholly irrelevant. The question is not how, or under what circumstances the Foam Chemicals were ordered for the High Point and Tupelo facilities or by whom, the question is whether the antitrust *claim* was "used" at either place. Clearly, it was not.

to-day operations of either the High Point or Tupelo facilities. It arises from the unlawful actions of the <u>Urethane</u> Defendants in fixing prices. Simply because the damages occasioned by such actions can be severed and thereafter apportioned to individual plants (like the ones in High Point and Tupelo) is of no moment. The provisions on which FFP relies simply does not extend to such claims.

This brings the Court to the one provision in the Agreements that specifically addresses the asset at issue, § 2.2(n). Pursuant to § 2.2(n), Vitafoam excluded from the sale to FFP "all intangible rights and property of Seller not used exclusively in the Business (provided that such rights and property are not material to the conduct of the Business as conducted immediately prior to the Closing)." [Doc. 37-3 at 30; 70]. Vitafoam's <u>Urethane</u> cases antitrust claim complies with each element of § 2.2(n). First, the antitrust claim is an intangible right and property of Vitafoam. Second, as explained above, the antitrust claim was never "used" at the High Point or Tupelo facilities. Finally, the antitrust claim was "not material to the conduct of the" High Point and Tupelo plants at all, let alone immediately prior to the closing on the Agreements.

Vitafoam's <u>Urethane</u> cases antitrust claim falls squarely within the assets excluded from transfer to FFP under § 2.2(n) of the Agreements.

14

Because the Agreements are unambiguous, and because Vitafoam retained ownership of the antitrust claim, Vitafoam, therefore, is entitled to summary judgment on this issue.

B.    A Valid Contract Precludes an Unjust Enrichment Claim.

FFP asserts a claim for unjust enrichment in Court Two of its Complaint.  An action for unjust enrichment, under North Carolina law, may be described more precisely as a request for restitution.

> In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party. The benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances. The benefit must not be gratuitous and it must be measurable.

Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556, (1988).  Adding to the unusual character of unjust enrichment, such a claim is neither an action sounding in tort nor contract but a "claim in quasi contract or a contract implied in law."  Id.  Its most significant feature, for purposes of this litigation, is its unavailability as a claim for damages if an express contract between the parties exists to resolve the damages dispute.    Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962) (it is a well-established principle that an express contract precludes an implied contract with reference to the same matter).  The rationale for this principle is self-evident:  an express and an implied contract cannot

exist at the same time for the same purpose. "It is only when parties do not expressly agree that the law interposes and raises a promise." Id.

In crafting Count Two of the Complaint in the manner that it has, FFP has pled itself out of court. FFP alleges that "Vitafoam has asserted ownership over *Urethanes* Claims that belong to FFP pursuant to the Agreements." [Doc. 1 at 8, ¶51 (emphasis added)]. FFP, by its own admission then, recognizes that the nature of this dispute is actually a claim for breach of an express contract. Having determined above that Vitafoam's ownership of the antitrust claim was a contractual matter addressed by the parties in the Agreements, the Court concludes that FFP's claim for unjust enrichment should be dismissed as a matter of law and judgment rendered in favor of Defendants on this claim. FFP's admission that the Agreements govern the ownership of the antitrust claim only helps to substantiate the Court's conclusion.

C.    FFP's Conversion Cause of Action Fails as a Matter of Law.

Count Three of FFP's Complaint alleges that Vitafoam obtained the Urethane cases claim, and the settlement proceeds flowing therefrom, without authorization and thereafter converted the same to its own use and benefit. [Doc. 1 at 9 ¶58] (FFP "acquired the Urethanes Claims and all proceeds from those Claims under the Agreements."). FFP's conversion

cause of action fails for two independent reasons.

First, the Court has ruled that ownership of the antitrust claim is vested in Vitafoam pursuant to the Agreements. Conversion in North Carolina is a tort. Lake Mary LLP v. Johnston, 145 N.C.App. 525, 531, 551 S.E.2d 546, 552 (2001). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner." Gallimore v. Sink, 27 N.C.App. 65, 67, 218 S.E.2d 181, 183, (1975) (citation omitted). To prevail on a conversion claim, a plaintiff must prove the following two essential elements: (1) ownership of a thing vested in the plaintiff and, (2) and a wrongful conversion of the thing by the defendant. Id. Because the Court has ruled that ownership of the antitrust claim is vested in Vitafoam pursuant to the Agreements, FFP's conversion theory of liability against Defendants legally fails. FFP cannot satisfy the first element of the conversion cause of action, its rightful ownership of the antitrust claim.

Second, North Carolina law defines conversion as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C.App. 390, 414, 537 S.E.2d 248, 264 (2000), review denied

353 N.C. 378, 547 S.E.2d 14 (2001) (citations omitted). "In North Carolina, only goods and personal property are properly the subjects of a claim for conversion." Id. "[I]ntangible interests such as business opportunities and expectancy interests [are not] subject to a conversion claim." Id.; in accord, TSC Research, LLC v. Bayer Chemicals Corp., 552 F.Supp.2d 534, 542-43 (M.D.N.C. 2008) (only tangible, not intangible, property is subject to conversion under North Carolina law). An "intangible asset" is "an asset that is not a physical object[.]" Edmondson v. American Motorcycle Ass'n, Inc., 7 Fed.Appx. 136, 148 (4th Cir. 2001) (intangible assets under North Carolina law include patents, trademarks, and goodwill). Like patents, trademarks, and goodwill, a chose in action is an intangible asset. In re Edmundson, 273 N.C. 92, 95, 159 S.E.2d 509, 511-12 (1968) (the potential right of the administrator of decedent's estate against the insurance company was a chose in action, an intangible asset of the estate); In Re Scarborough, 261 N.C. 565, 135 S.E.2d 529 (1964) (a cause of action for wrongful death is an intangible asset).

Since FFP alleges Vitafoam converted the Urethane cases claim, and since the Urethane cases claim – a chose in action – is an intangible asset rightfully belonging to Vitafoam, it could not be subject to conversion by Vitafoam under North Carolina law. The Court concludes that judgment as

a matter of law in favor of the Defendants on this claim is appropriate.

D.    The Statute of Limitations.

Even if FFP were the rightful owner of the antitrust claim under the Agreements, its contract action in this Court would be barred as untimely. In North Carolina, a cause of action "[u]pon a contract, obligation or liability arising out of a contract, express or implied," must be commenced within three years.    N.C. Gen. Stat. § 1–52(1); Housecalls Home Health Care, Inc. v. Dep't of Health and Human Servs., 200 N.C. App. 66, 70, 682 S.E.2d 741, 744 (2009) (the statute of limitations for bringing a cause of action for breach of contract, conversion, or unjust enrichment is three years).  When ascertaining the accrual of a cause of action under North Carolina law, the general rule is that as soon as

> the right of the party is once violated, even in ever so small a degree, the injury, in the technical acceptation of that term, at once springs into existence and the cause of action is complete.

Mast v. Sapp, 140 N.C. 533, 540, 53 S.E. 350, 352 (1906). Thus, the statute begins to run when the claim accrues. "[F]or a breach of contract action, the claim accrues upon breach." Miller v. Randolph, 124 N.C.App. 779, 781, 478 S.E.2d 668, 670 (1996).

In this matter, the crux of the dispute, as stated at the very beginning of this discussion, centers on the ownership of the Urethane cases antitrust

claim. The Court has determined that Vitafoam did not sell that claim to FFP under the Agreements but retained that claim. Had Vitafoam conveyed those portions of the claim to FFP as an intangible asset pursuant to the Agreements, Vitafoam would have breached the Agreements the moment Vitafoam asserted any right to seek recovery from the <u>Urethane</u> cases defendants via a claim it no longer owned. Had FFP been the proper owner of the antitrust claim, Vitafoam first injured FFP – first breached the Agreements – when it asserted it was the true owner of <u>Urethane</u> cases antitrust claim and entitled to recover *any* <u>Urethane</u> cases antitrust damages by submitting its June 9, 2006, notice to the Bayer claims administrator.

FFP argues that the operative breach time was "not until January or May 2012 [when] Vitafoam first informed FFP that it did not intend to honor the Purchase Agreements." [Doc. 37-1 at 21]. Notice to FFP, however, was irrelevant. It is a well-settled rule in North Carolina that the statute of limitations for a breach of contract action is not tolled pending the injured party's discovery of the breach. "As this Court has stated on numerous occasions, a plaintiff's lack of knowledge concerning his claim does not postpone or suspend the running of the statute of limitations." <u>Pearce v. N.C. State Hwy. Patrol Vol. Pledge Cmte.</u>, 310 N.C. 445, 451, 312 S.E.2d

421, 425-26 (1984).

Nevertheless, FFP maintains that it was not injured, and therefore the statute did not begin to run, until there were settlement proceeds that FFP was entitled to demand. [Doc. 37-1 at 21]. FFP's argument is based upon a false premise. FFP asserts that, "[w]hen the Purchase Agreements closed, Vitafoam had not yet breached its contract to assign the *Urethanes* claims to FFP, nor had FFP suffered any injury when Vitafoam filed opt-out notices and produced documents responsive to discovery requests in *Urethanes*." [Id. (emphasis added)]. The Urethane cases antitrust claim was not a future interest. If Vitafoam sold the claim, Vitafoam's conveyance of the antitrust claim to FFP would have occurred simultaneously with the transfer of all of the other assets to FFP upon the parties' execution of the Agreements. Therefore, Vitafoam would have breached the Agreements the instant it sought damages based on its assertion of ownership of the antitrust claim. For this reason, the cases of Hamilton v. Memorex Telex Corp., 118 N.C. App. 1, 454 S.E.2d 278, disc. rev. denied, 340 N.C. 260, 456 S.E.2d 830 (1995) and Glover v. First Union Nat'l Bank, 109 N.C. App. 451, 428 S.E.2d 206 (1993) cited by FFP are inapposite. [Doc. 37-1 at 21].

Alternatively, FFP asserts that North Carolina's "continuing wrong"

doctrine stopped the limitations' clock. [Docs. 37-1 at 22-3; 43 at 9-10]. Concisely put, FFP contends that "Vitafoam's later affirmative actions requesting proceeds from new settlements of separate claims against different entities were continuing violations that restarted the statute of limitations." [Doc. 37-1 at 22-3]. FFP misapprehends the continuing wrong doctrine.

Once again, the North Carolina Supreme Court's decision in Mast is instructive. It sets forth the applicability of the tolling mechanism (later came to be known as the continuing wrong doctrine) as follows.

> This [accrual] principle, as we have shown, does not apply to a case of a nuisance or trespass, which torts are continuing in their nature; the nuisance of today being a substantive cause of action, and not the same with the nuisance of yesterday, and likewise in the case of a continuing trespass. If the trespass consists in one single act of wrong, and has not in it the element of continuance, the general rule we have stated will apply; for where there is the same reason, there must be the same law.

Mast, 140 N.C. at 540-41, 53 S.E. at 252 (citation omitted). The teaching of Mast, then, is that a continuing wrong presupposes a continuing obligation or continuing duty as a condition precedent, hence the opinion's examples of nuisance and trespass. In the contract action at bar, assuming FFP was the lawful owner of the Urethane cases antitrust claim, there was only one duty of performance, and thus, there could only be one such

breach.  As the North Carolina Supreme Court eloquently observed nearly a century after its <u>Mast</u> decision, "[a] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation."  <u>Williams v. BCBS of NC</u>, 357 N.C. 170, 178, 581 S.E.2d 415, 422 (2003), citing with approval, <u>Ward v. Caulk</u>, 650 F.2d 1144, 1147 (9th Cir. 1981).  Had FFP been the rightful owner of the <u>Urethane</u> cases antitrust claim, Vitafoam's numerous requests for, and various receipts of, settlement damages from the <u>Urethane</u> cases defendants was nothing more than "the continual ill effects" from Vitafoam's original breach of the Agreements by asserting ownership over the antitrust claim it previously had sold.

The rightful owner of the antitrust claim is the entity entitled to receive the antitrust damages, whether those damages are paid piecemeal by some or all of the <u>Urethane</u> cases defendants at differing points in time, or as one lump sum.  Had FFP owned the antitrust claim pursuant to the Agreements, Vitafoam would have breached the Agreements on June 9, 2006, when Vitafoam filed with the Bayer Administrator its demand for antitrust damages for the Foam Chemicals supplied to the High Point and Tupelo facilities during the antitrust damages period.  Further, the statute of limitations' commencement time of June 9, 2006, due to Vitafoam's

breach, would not have been suspended by the tolling mechanism of the continuing wrong doctrine because Vitafoam did not continue to breach the Agreements – it thereafter only received the benefits flowing from the fruit of such alleged breach, its enforcement of the antitrust claim. Finally, because FFP did not commence this action before June 10, 2009, it is barred by North Carolina's three year statute of limitations applicable to breach of contract claims.

## CONCLUSION

Based on the foregoing, the Court concludes that Vitafoam did not convey its antitrust claim to FFP pursuant to the Agreements. FFP's claims against Vitafoam for unjust enrichment and conversion fail as a matter of law. Finally, even if Vitafoam had conveyed its antitrust claim to FFP, this action would be barred by the North Carolina statute of limitations since it was commenced well outside the applicable limitations period.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 33] is hereby **GRANTED** and the Plaintiff's Motion for Summary Judgment [Doc. 37] is hereby **DENIED**.

**IT IS FURTHER ORDERED AND DECLARED** that the two subject

Asset Purchase Agreements executed between the Plaintiff and the Defendants effective December 30, 2005, are valid and binding contracts between the parties, and pursuant thereto Defendants conveyed no rights to the Plaintiff which would permit it to make any antitrust claim for damages against the <u>Urethane</u> cases defendants for the Foam Chemicals delivered to the manufacturing facilities subject to the Asset Purchase Agreements located in High Point, North Carolina, and Tupelo, Mississippi, during the <u>Urethane</u> cases damages period of 1999 to 2003.

**IT IS SO ORDERED.**

Signed: October 30, 2013

Martin Reidinger
United States District Judge